**CHEMICAL TRANSPORTER INC., as owner of the SS CHEMICAL TRANSPORTER, Plaintiff-Appellee,**

v.

**READING COMPANY, Defendant-Appellant.**

**Nos. 402 and 403, Dockets 33647 and 33648.**

United States Court of Appeals, Second Circuit.

Argued Jan. 8, 1970.

Decided May 6, 1970.

William J. Troy, New York City, for plaintiff-appellee.

Timothy A. Hanan, New York City (Macklin, Hanan & McKernan, New York City, on the brief), for defendant-appellant.

Before LUMBARD, Chief Judge, FRIENDLY, Circuit Judge, and MANSFIELD, District Judge.*

* Sitting by designation.

LUMBARD, Chief Judge:

These cross-appeals both question the judgment of the district court which was based on findings that two vessels in collision in the Kill Van Kull in the early morning of February 10, 1964, were equally at fault. Upon a review of such evidence as is undisputed, and accepting the factual findings of the district court, we believe that the district court's conclusions were clearly erroneous. We find that the SS Chemical Transporter was solely at fault, and accordingly, we reverse the judgment.

In the early morning of February 10, 1964, the 525 foot long T-2 tankship SS Chemical Transporter, having proceeded down New York harbor and rounded Robbins Reef into Kill Van Kull which separates Staten Island from New Jersey, headed up the Constable Hook Range, west northwest at 290 degrees. Meanwhile the tug Shamokin, with the loaded coal barge Tracy Barge No. 117 tied to her port side, was proceeding east, a few degrees north, near mid-channel, on the Staten Island side of the Kill. Also heading east in the Kill was the tug Latin America, parallel to the Shamokin, but on the north side of the Kill. Thus, just before the Transporter sounded its first two signal blast, Transporter was port to port with Shamokin and starboard to starboard with the Latin America. Had the Shamokin and the Transporter followed the applicable rules in such situations, the Transporter and Shamokin would have passed port to port and the Transporter and Latin America would have passed starboard to starboard—i. e., the Transporter would have passed between the Shamokin on her port and the Latin America on her starboard.

In any event, at 2:37 A.M. the Transporter blew a two whistle blast, with the Shamokin only half a mile away. The court found that this signal was directed at the Shamokin to indicate that Transporter intended to effect a starboard to starboard passing. However, as Latin America was to the north and already on a starboard to starboard position with Transporter, Captain Dentz of the Shamokin quite properly assumed that the Transporter's signal was intended for the Latin America. Accordingly, the Shamokin did not answer the signal. As the Transporter attempted to pass Shamokin starboard to starboard, finally putting her engines in full reverse, while Shamokin continued on her course with the barge in tow, the inevitable occurred at 2:40 A.M. when the Transporter collided with the port bow of Tracy Barge No. 117. The Transporter immediately thereafter ran aground on the Staten Island shore and sustained damages which the district court computed at $48,448.12.

On these facts we think it clear that Transporter was solely at fault.

■■ None of the rules of navigation for inland or harbor waters justified the Transporter in seeking to make a starboard to starboard passing with the Shamokin. The general rule is that ships must pass port to port whenever they are head to head (33 C.F.R. 80.4) [1]

---

1. 33 C.F.R. 80.4

§ 80.4 *Vessels approaching each other head and head, end on.*

(a) When steam vessels are approaching each other head and head, that is, end on, or nearly so, it shall be the duty of each to pass on the port side of the other, and either vessel shall give, as a signal of her intention one short and distinct blast of her whistle, which the other vessel shall answer promptly by a similar blast of her whistle, and thereupon such vessels shall pass on the port side of each other. But if the courses of such vessels are so far on the starboard of each other as not to be considered as meeting head and head, either vessel shall immediately give two short and distinct blasts of her whistle, which the other vessel shall answer promptly by two similar blasts of her whistle, and they shall pass on the starboard side of each other.

(b) The foregoing only applies to cases where vessels are meeting end on or nearly end on, in such a manner as to involve risk of collision; in other words, to cases in which, by day, each vessel sees the masts of the other in a line, or nearly in a line, with her own, and by night to cases in which each

or oblique (33 C.F.R. 80.7).[2] According to the findings below, which are amply supported, these ships were oblique. A starboard to starboard crossing between them was improper, and not authorized by 33 C.F.R. 80.4, which permits such a crossing only when they are starboard to each other at the time of signal, which was not the case here. On the other hand, since the Transporter and Latin America apparently were starboard to starboard when the signal was given, such a passing between them was authorized by 33 C.F.R. 80.4 upon the Transporter's giving a two-blast signal. No reasonably prudent navigator in Captain Dentz's position could have been expected to interpret Transporter's signal as being directed to the Shamokin. Captain Dentz was fully justified in holding to his course in the reasonable belief that Transporter meant to go between Shamokin and the Latin America. In short, the Transporter should have held to her course, allowing the Shamokin to pass port to port. Instead of that she deviated and collided with the barge.

Inasmuch as Transporter was solely responsible for initiating the maneuver which caused the collision, and since Shamokin was under no obligation to answer the two-blast signal, we must conclude that Transporter was solely at fault. In view of our conclusion, we need not consider the claim of the Reading Company that the trial court had before it no competent evidence on the issue of damages.

The judgment is reversed with direction to enter judgment for the Reading Company, owner of the Shamokin.

FRIENDLY, Circuit Judge (dissenting):

It is not clear to me that, in light of Article 27 of the Inland Rules, 33 U.S.C. § 212, requiring "due regard * * * to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger," the Chemical Transporter was at fault in proposing a starboard to starboard passing with the Shamokin rather than pass between her and the Latin America. See Gilmore & Black, Admiralty, 420 (1956). However, she surely was at fault for turning to port without having received the Shamokin's assent, and the important question is thus whether the Shamokin was also to blame, as the district judge concluded. I find it rather incredible that the Shamokin should have understood the two blast signal to have been directed to the Latin America, which was at the extreme edge of the channel if not entirely out of it, rather than to the vessel that lay directly on the Transporter's course and a half-mile ahead. At best the Shamokin should have been in grave doubt as to the

vessel is in such a position as to see both the side lights of the other.

(c) It does not apply by day to cases in which a vessel sees another ahead crossing her own course, or by night to cases where the red light of one vessel is opposed to the red light of the other, or where the green light of one vessel is opposed to the green light of the other, or where a red light without a green light or a green light without a red light is seen ahead, or where both green and red lights are seen anywhere but ahead.

2. 33 C.F.R. 80.7

§ 80.7 *Vessels approaching each other at right angles or obliquely.*

(a) When two steam vessels are approaching each other at right angles or obliquely so as to involve risk of collision, other than when one steam vessel is overtaking another, the steam vessel which has the other on her own port side shall hold her course and speed; and the steam vessel which has the other on her own starboard side shall keep out of the way of the other by directing her course to starboard so as to cross the stern of the other steam vessel, or, if necessary to do so, slacken her speed or stop or reverse.

(b) If from any causes the conditions covered by this situation are such as to prevent immediate compliance with each other's signals, the misunderstanding or objection shall be at once made apparent by blowing the danger signal, and both steam vessels shall be stopped and backed if necessary, until signals for passing with safety are made and understood.

Transporter's intentions, as the trial judge found, and accordingly should have blown a danger signal rather than turn to starboard and steam ahead down the channel without having reached a passing agreement. I fear this is another case like M. P. Howlett, Inc. v. Tug Michael Moran, 2 Cir., 425 F.2d 619, decided April 16, 1970, where appellate judges are whetting their appetite for dealing with facts rather than leaving these to the district judge who saw and heard the witnesses.

I would affirm the judgment dividing damages and return the case to the district court for a better assessment of their amount.